Laura Smith (ARDC 6300907)
Laura@ChildrensLegalCenterChicago.org
Brigitte Nuss Kocheny (ARDC 6227001)
Brigitte@ChildrensLegalCenterChicago.org
Children's Legal Center
1100 W Cermak Rd., Suite 422
Chicago, Illinois 60608
(312) 722-6642

*Attorneys for Petitioner*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS

| | |
|---|---|
| **F.J.C.G.**                  ) | Case No. _____ |
|                        ) | |
|     Petitioner,        ) | |
|                        ) | **PETITIONER'S MEMORANDUM** |
| v.                         ) | **OF LAW IN SUPPORT OF** |
|                        ) | **MOTION FOR TEMPORARY** |
| **MICHAEL J SMITH**, Warden, Broadview   ) | **RESTRAINING ORDER AND** |
| Processing Center; **LADEON FRANCIS,** Director ) | **PRELIMINARY INJUNCTION** |
| of Chicago Field Office,          ) | |
| U.S. Immigration and Customs Enforcement;    ) | |
| **KRISTI NOEM,** Secretary of the U.S. Department ) | |
| of Homeland Security; and **PAMELA BONDI,**   **)** | |
| Attorney General of the United States,      ) | |
| in their official capacities,          ) | |
|                        ) | |
|     Respondents.      ) | |

Petitioner F.J.C.G. respectfully moves for entry of a temporary restraining order and

preliminary injunction:

1. ENJOINING, pursuant to Fed. R. Civ. 65, all Respondents and all persons in active
   concert or participation with them, from transporting Petitioner outside of the venue of
   the Chicago Immigration Court; and

2. ENJOINING, pursuant to Fed. R. Civ. 65, all Respondents and all persons in active
   concert or participation with them, from transferring, relocating, or removing Petitioner
   from the United States without an Order from the Court.

## TABLE OF CONTENTS

TABLE OF CONTENTS..................................................................................................... 2

TABLE OF AUTHORITIES ............................................................................................. 2

   INTRODUCTION ........................................................................................................... 3

   LEGAL AND FACTUAL BACKGROUND ................................................................. 6

      I.   The Alien Enemies Act ........................................................................................... 6

      II.   Congress's Comprehensive Reform of Immigration Law........................................... 6

      III.   The AEA Proclamation and the Unlawful Removals.................................................. 7

      IV.   Petitioner........................................................................................................... 9

   LEGAL STANDARD.................................................................................................... 11

   ARGUMENT ................................................................................................................. 12

      I.   Petitioner is Likely to Succeed on the Merits ...................................................... 12

      II.   Petitioner Satisfies the Remaining Requirements for Injunctive Relief.................... 15

      III.   The All Writs Act Confers Broad Power to Preserve the Integrity of Court Proceedings .................................................................................................................... 17

      IV.   The Court Should Not Require Petitioner to Provide Security Prior to the Temporary Restraining Order ........................................................................................ 18

   CONCLUSION.............................................................................................................. 18

## TABLE OF AUTHORITIES

**Cases**

. *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *2 (D.C. Cir. Mar. 26, 2025) .......... passim

*Adams v. United States*, 317 U.S. 269, 273 (1942)....................................................... 17

*Aliyev v. Mukasey*, 549 F.3d 111 ................................................................................. 7

*Boone v. Brown*, No. Civ. 05-750, 2005 WL 2006997, at *15 (D.N.J. Aug. 22, 2005)............... 16

*Buck v. Stankovic*, 485 F. Supp. 2d 576, 586-587 (M.D. Pa. 2007) ............................ 16

*California v. M&P Inv.*, 46 F. App'x 876, 878 (9th Cir. 2002)...................................... 17

*Cradle of Liberty Council, Inc. v. City of Philadelphia*, No. CIV.A. 08-2429, 2010 WL 760250, at *1 (E.D. Pa. Mar. 2, 2010) .................................................................................... 18

*F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 604 (1966) ................................................. 17

*In Re: Nat'l Football League Players Concussion Injury Litigation*, 923 F.3d 96, 109 (3d Cir. 2019) ............................................................................................................................ 17

*INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999)...................................................... 7

*INS v. Cardoza-Fonseca*, 480 U.S. 421, 439-40 (1987).............................................. 7

*ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978)....................... 18

*J.A.V. v. Trump*, No. 1:25-CV-072, 2025 WL 1064009, at *1 (S.D. Tex. Apr. 9, 2025) ............ 17

*J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-3 (Hanson Decl.) ¶ 28. .............................................. 15

*Michael v. INS*, 48 F.3d 657, 664 (2d Cir. 1995) ......................................................................... 18

*Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) .................................................................. 14

*Noem v. Abrego Garcia*, No. 24A949, 2025 WL 1077101, at *1 (U.S. Apr. 10, 2025) .... 5, 12, 13

*Pittsburgh-Des Moines Steel Co. v. United Steelworkers of Am., AFL-CIO*, 633 F.2d 302, 307
      (3d Cir. 1980)............................................................................................................................ 18

*Ragbir v. United States*, No. 2:17-CV-1256-KM, 2018 WL 1446407, at *18 (D.N.J. Mar. 23,
      2018) .......................................................................................................................................... 17

*S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.*, 145 F. Supp. 2d 446, 504 (D.N.J.
      2001) .......................................................................................................................................... 18

*Snider v. Temple Univ.*, 502 U.S. 1032 (1992) ........................................................................... 18

*Temple Univ. v. White*, 941 F.2d 201, 219 (3d Cir. 1991) .......................................................... 18

*Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 178 (3d Cir. 2002) ................... 16

*United States ex rel. Dorfler v. Watkins*, 171 F.2d 431, 432 (2d Cir. 1948) ................................ 6

*United States v. Tinoso*, 327 F.3d 864, 867 (9th Cir. 2003) ....................................................... 14

*Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008) .................................................... 12

**Statutes**

28 U.S.C. § 1651 .......................................................................................................................... 18

50 U.S.C. § 21 ........................................................................................................................... 6, 7

8 U.S.C. § 1158 ......................................................................................................................... 7, 8

8 U.S.C. § 1229a(a)(3) ............................................................................................................. 7, 14

8 U.S.C. § 1231(b)(3) ................................................................................................................ 7, 8

8 U.S.C. § 1531 ............................................................................................................................ 14

*8 U.S.C.* § 1532(a) ..................................................................................................................... 14

8 U.S.C. § 1533(a)(1) ................................................................................................................... 14

8 U.S.C. § 1534(a)(2) ................................................................................................................... 14

INA § 240 ...................................................................................................................................... 14

**Other Authorities**

S. Rep. No. 82-1137 (Jan. 29, 1952)........................................................................................... 14

## INTRODUCTION

Petitioner-Plaintiff ("Petitioner") respectfully requests an immediate Temporary Restraining Order ("TRO") to avoid irreparable harm to Petitioner and to ensure that this Court is not potentially deprived, permanently, of jurisdiction.

In a Proclamation signed on March 14, 2025 but not made public until March 15, 2025 (after the government had already attempted to use it), the President invoked a war power, the

Alien Enemies Act of 1798 ("AEA"), to summarily remove noncitizens from the U.S. and bypass the immigration laws that Congress enacted. *See* Invocation of the Alien Enemies Act (Mar. 15, 2025) ("Proclamation").[1] The AEA permits the President to invoke the AEA only where the United States is in a "declared war" with a "foreign government or nation," or where a "foreign government or nation" is threatening to, or has engaged in, an "invasion or predatory incursion" against the "territory of the United States." The Proclamation targets Venezuelan noncitizens accused of being part of Tren de Aragua ("TdA"), a criminal gang, and claims that the gang is engaged in an "invasion and predatory incursion" within the meaning of the AEA.

On the evening of March 15, a D.C. District Court issued an order temporarily pausing removals pursuant to the Proclamation for a provisionally certified nationwide class. *J.G.G. v. Trump*, No. 25-5067, 2025 WL 914682, at *2 (D.C. Cir. Mar. 26, 2025). The D.C. Circuit denied the government's motion to vacate that TRO. On April 7, 2025 in a 5-4 decision, the Supreme Court granted the government's application to vacate the TRO order on the basis that the named *J.G.G.* petitioners had to proceed through habeas, without reaching the merits of whether the Proclamation exceeds the President's power under the AEA. In doing so, however, the Court emphasized that individuals who are designated under the AEA Proclamation are "entitle[d] to due process" and notice "within a reasonable time and in such manner as will allow them to actually seek habeas relief" before removal. *Trump v. J.G.G.*, No. 24A931, 2025 WL 1024097, at *2 (U.S. Apr. 7, 2025).

To date, the government has not indicated the type of notice they intend to provide or how much time they will give individuals before seeking to remove them under the AEA. However, in a hearing in the Southern District of Texas on Friday, April 11, 2025, the government said they

---

[1] https://perma.cc/ZS8M-ZQHJ.

had not ruled out the possibility that individuals will receive no more than 24 hours' notice; the government did not say whether it was considering providing even less than 24 hours.

In light of the government's detainment of Petitioner without due process, transfer of Petitioner from DDF and from access to counsel, and the government's statement that Petitioner may receive less than 24 hours' notice of removal from the United States under the AEA, Petitioner brings this habeas action.

**Accordingly, Petitioner moves the Court for a TRO barring his summary removal under the AEA and barring Respondents from relocating him outside of the venue of the Chicago Immigration Court.** Immediate intervention by this Court is required because the vacatur of the D.C. district court's TRO no longer protects individuals in Petitioner's situation and, at most, Petitioner may only be given 24 hours' notice of his removal from the United States.  In addition, the government has taken the position that the federal courts will lose jurisdiction once the removal has been effectuated and that there will be no way to correct any erroneous removal. Indeed**,** in the government's rush to transfer individuals to El Salvador, the government has mistakenly deported at least one Salvadoran man without legal basis and now claims – in direct contravention to the ruling of the court - that individual cannot be returned. *See Noem v. Abrego Garcia*, No. 24A949, 2025 WL 1077101, at *1 (U.S. Apr. 10, 2025). Declarations and news accounts suggest that many of the alleged Venezuelan TdA members sent to El Salvador pursuant to the Proclamation at issue here were not in fact TdA members. *See* Plfs' Mot. for Prelim. Injunction, *J.G.G.*, No. 25-cv-766-JEB (D.D.C. Mar. 28, 2025), EF No. 67-1 at 3–7 (describing accounts and evidence of individuals without ties to TdA).

The TRO sought here does *not* seek to prohibit the government from prosecuting any individual who has committed a crime. Nor does it seek release from immigration detention or to

prohibit the government from removing any individual who may lawfully be removed under the immigration laws.

## LEGAL AND FACTUAL BACKGROUND

### I.    The Alien Enemies Act

The AEA is a wartime authority that grants the President specific powers with respect to the regulation, detention, and deportation of enemy aliens. Passed in 1798, the AEA, as codified today at 50 U.S.C. § 21, provides:

> Whenever there is a declared war between the United States and any foreign nation or government, or any invasion or predatory incursion is perpetrated, attempted, or threatened against the territory of the United States by any foreign nation or government, and the President makes public proclamation of the event, all natives, citizens, denizens, or subjects of the hostile nation or government, being of the age of fourteen years and upward, who shall be within the United States and not actually naturalized, shall be liable to be apprehended, restrained, secured, and removed as alien enemies.

This Act has been used only three times in the country's history and each time in a period of war: the War of 1812, World War I, and World War II.

The Act also provides that individuals designated as enemy aliens will generally have time to "settle affairs" before removal and the option to voluntarily "depart."[2] *See, e.g.*, *United States ex rel. Dorfler v. Watkins*, 171 F.2d 431, 432 (2d Cir. 1948) ("An alien must be afforded the privilege of voluntary departure before the [AG] can lawfully remove him against his will.").

### II.    Congress's Comprehensive Reform of Immigration Law

Following World War II, Congress consolidated U.S. immigration laws into a single text under the Immigration and Nationality Act of 1952 ("INA"). The INA, and its subsequent

---

[2] 50 U.S.C. § 21 (providing for removal of only those "alien enemies" who "refuse or neglect to depart" from the U.S.); *id.* § 22 (granting time for departure in accordance with treaty stipulation or "where no such treaty exists, or is in force," a "reasonable time as may be consistent with the public safety, and according to the dictates of humanity and national hospitality").

amendments, provide a comprehensive system of procedures that the government must follow before removing a noncitizen from the U.S. *See* 8 U.S.C. § 1229a(a)(3) (INA provides "sole and exclusive procedure" for determining whether noncitizen may be removed).

As part of that reform and other subsequent amendments, Congress prescribed safeguards for noncitizens seeking protection from persecution and torture. These protections codify the humanitarian framework adopted by the United Nations in response to the humanitarian failures of World War II. *See INS v. Cardoza-Fonseca*, 480 U.S. 421, 439-40 (1987); *Aliyev v. Mukasey*, 549 F.3d 111, 118 n.8 (2d Cir. 2008) ("It is no accident that many of our asylum laws sprang forth as a result of events in 1930s Europe."). First, the asylum statute, 8 U.S.C. § 1158, provides that any noncitizen in the U.S. has a right to apply for asylum. Second, the withholding of removal statute, 8 U.S.C. § 1231(b)(3), provides that noncitizens "may not" be removed to a country where their "life or freedom" would be threatened based on a protected ground. *See INS v. Aguirre-Aguirre*, 526 U.S. 415, 420 (1999) (withholding is mandatory upon meeting statutory criteria). Third, protections under the Convention Against Torture ("CAT") prohibit returning noncitizens to a country where it is more likely than not that they would face torture. *See* Foreign Affairs Reform and Restructuring Act of 1998 ("FARRA") § 2242(a), Pub. L. No. 105-207, Div. G. Title XXI, 112 Stat. 2681 (codified at 8 U.S.C. § 1231 note); 8 C.F.R. § 1208.16-.18.

## III.    The AEA Proclamation and the Unlawful Removals

On March 14, 2025, the President signed the AEA Proclamation at issue here. It provides that "all Venezuelan citizens 14 years of age or older who are members of TdA, are within the United States, and are not actually naturalized or lawful permanent residents of the United States are liable to be apprehended, restrained, secured, and removed as Alien Enemies." *See* Proclamation. Although the AEA calls for a "public proclamation," 50 U.S.C. § 21, the

7

administration did not make the invocation public until around 3:53 p.m. EDT on March 15. As set forth more fully in Judge Boasberg's opinion, and by the D.C. Circuit, even prior to the Proclamation's publication the government sought to remove individuals. *J.G.G. v. Trump*, No. 1:25-cv-766-JEB (D.D.C. Mar. 18, 2025), ECF No. 28-1 (Cerna Decl.) ¶ 5; *J.G.G.*, 2025 WL 890401, at *3 (D.D.C. Mar. 24, 2025) (noting that prior to publication of Proclamation, and after a lawsuit was filed against the summary removals, it appeared that "the Government . . . was nonetheless moving forward with its summary-deportation plans.")

In addition to claiming that a *criminal gang* during *peacetime* satisfies the AEA's statutory predicates, the Proclamation does not provide any process for individuals to contest that they are members of the TdA and do not therefore fall within the terms of the Proclamation. The Proclamation also supplants the removal process under the congressionally enacted immigration laws, which, among other things, provide a right to seek protection from persecution and torture. *See, e.g.*, 8 U.S.C. §§ 1158, 1231(b)(3), 1231 note.

To date, at least 137 Venezuelan men have been removed under the Proclamation and are now in El Salvador in one of the most notorious prisons in the world, possibly for the rest of their lives. Whether most (or perhaps all) of the nationwide class lacks ties to TdA remains to be seen, because Respondents secretly rushed the men out of the country and have provided no information about them. But evidence since these individuals were sent to El Salvador flights on March 15 increasingly shows that many were not "members" of TdA. *See J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-21 (Sarabia Roman Decl., Exhs. 4-20) (media reports regarding evidence contradicting gang allegations). Such false accusations are particularly devastating given Petitioner's claims for relief under our immigration laws. *See* Exhibit A and Exhibit B.

The government's errors are unsurprising, given the methods it is employing to identify members of TdA. The "Alien Enemy Validation Guide" that the government has used to ascertain alien enemy status, requires ICE officers to tally points for different categories of alleged TdA membership characteristics. *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-21 (Sarabia Roman Decl., Exh. 1). The guide relies on a number of dubious criteria, including physical attributes like "tattoos denoting membership/loyalty to TDA" and hand gestures, symbols, logos, graffiti, or manner of dress. But experts who study the TdA have explained how none of these physical attributes are reliable ways of identifying gang members. *Id.* at 67-3 (Hanson Decl.) ¶¶ 22-24, 27; *id.* at 67-4 (Antillano Decl.) ¶ 14; *id.* at 67-12 (Dudley Decl.) ¶ 25.

Experts on El Salvador have also explained how those removed there face grave harm and torture at the Salvadoran Terrorism Confinement Center ("CECOT"), including electric shocks, beating, waterboarding, and use of implements of torture on detainees' fingers. *See J.G.G.*, 2025 WL 1024097, at *9 (U.S. Apr. 7, 2025) (Sotomayor, J., dissenting); *see also J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 44-4 (Bishop Decl.) ¶¶ 21, 33, 37, 39, 41; *id.* at 44-3 (Goebertus Decl.) ¶¶ 8, 10, 17. These abusive conditions are life threatening, as demonstrated by the hundreds of people who have died in Salvadoran prisons. *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 44-3 (Goebertus Decl.) ¶ 5; *id.* at 44-4 (Bishop Decl.) ¶¶ 43–50. Worse, those removed and detained at CECOT face indefinite detention. *Id.* at 44-3 (Goebertus Decl.) ¶ 3 (quoting the Salvadoran government that people held in CECOT "will never leave"); Nayib Bukele, X.com post (Mar. 16, 2025, 5:13AM ET) (detainees "were immediately transferred to CECOT . . . for a period of one year (renewable)").[3]

## IV.    Petitioner

---

[3] https://perma.cc/52PT-DWMR.

On or about October 2, 2022, Petitioner entered the United States. Petitioner encountered DHS officers, was fingerprinted and detained for about one day. Upon information and belief, Petitioner was then released by DHS. On or about August 8, 2023, Petitioner filed an I-589 Application for Asylum and Withholding of Removal with USCIS. On or about December 7, 2023 Petitioner filed an I-821 Application for Temporary Protected Status (TPS).  Both of those applications are still pending with USCIS.

On March 21, 2025, ICE went to Petitioner's home and arrested Petitioner without obtaining a judicial warrant. Petitioner was placed in the custody of ICE, served with a Notice to Appear (NTA) and taken to the Broadview Processing Center in Broadview, Illinois.  The same day Petitioner was transferred to Dodge Detention Facility (DDF) in Juneau, Wisconsin.  On March 23, 2025 ICE filed the NTA with EOIR (Chicago Immigration Court) alleging that Petitioner is inadmissible to the United States.  With the assistance of his family, Petitioner sought legal representation in those proceedings from the organization now representing him.

Although counsel had been able to schedule telephone calls with Petitioner with 24-hours' notice to DDF, the exchange of written documentation ultimately was only possible via an in-person meeting at the detention facility. On March 23, 2025, Petitioner's counsel mailed documents to DDF for Petitioner to sign and return in an envelope that was provided. Upon information and belief, Petitioner signed said documents, placed them in the envelope, and gave the envelope to DDF staff to mail.  To date, those documents have not been received by counsel.

On April 8, 2025, Petitioner appeared for his Master Calendar Hearing via WebEx before the Immigration Court in Chicago, Illinois which was continued to April 24, 2025 for Petitioner's counsel to obtain documentation from DHS as to the reason for detention.  Counsel for Petitioner has been unable to submit a FOIA request to DHS for documentation as to the

reason for Petitioner's detainment because counsel has been unable to obtain the signatures on the FOIA forms.

On or about April 8, 2025, counsel mailed Petitioner the same FOIA documents to sign and return through USPS Priority Mail. Counsel included a pre-paid USPS Priority Mail envelope for the documents to be returned to counsel's office. Upon information and belief, Petitioner signed said documents, placed them in the USPS Priority Mail envelope, and gave it to DDF staff to mail.  As of the date of this memorandum, the envelope has not yet been placed in USPS mail pursuant to the USPS's tracking system.  (Tracking No. 9405530109355131527091). As counsel needs said documents for representation of Petitioner, counsel scheduled an in-person meeting to travel to DDF on April 18, 2025 to meet with Petitioner and obtain necessary signatures.

On April 11, 2025 counsel for Petitioner submitted an electronic written request to the Office of the Principal Legal Advisor (OPLA) for the I-213 Record of Deportable/Inadmissible Alien, which should contain the grounds for detention. As of the date of filing this petition, OPLA has not provided any documentation in response to counsel's request.

Upon information and belief, on April 14, 2025 Petitioner was transferred from DDF to Broadview Processing Center in Broadview, Illinois which is where Petitioner is currently located. Upon information and belief, Respondents intend to transfer Petitioner to a detention center in Texas for removal from the United States.

## LEGAL STANDARD

To obtain a TRO, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of

equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20 (2008).

## ARGUMENT

### I.    Petitioner is Likely to Succeed on the Merits

As the Supreme Court has now made clear, the government must provide Petitioner notice "within a reasonable time and in such a manner as will allow them to actually seek" relief from summary removals under the Proclamation. *J.G.G.*, 2025 WL 102409, at *2 ("detainees subject to removal orders under the AEA are entitled to notice and an opportunity to challenge their removal."). Because the government has not stated whether or how it will comply with the Supreme Court's recent order, a TRO is warranted to ensure that the government provides the Court with protocol for how it will provide notice. *See J.G.G.*, 2025 WL 102409, at *2 ("'It is well established that the Fifth Amendment entitles [noncitizens] to due process of law' in the context of removal proceedings."). At a minimum, the notice must be translated into a language that the individuals can understand; for Venezuelans, Spanish and English. Most importantly, there must be sufficient time for individuals to seek review. As during World War II, that notice must be provided at least 30 days in advance of any attempted removal, and it must be provided to undersigned counsel so that no individual is mistakenly removed. *See*, *e.g*., *Noem v. Abrego Garcia*, No. 24A949, 2025 WL 1077101 (U.S. Apr. 10, 2025)

### a.    Detention and Removal of Petitioner Violates Due Process

As the Supreme Court has now made clear, the government must provide Petitioner notice "within a reasonable time and in such a manner as will allow them to actually seek" relief from summary removals under the Proclamation. *J.G.G.*, 2025 WL 102409, at *2 ("detainees subject to removal orders under the AEA are entitled to notice and an opportunity to challenge their

removal."). Because the government has not stated whether or how it will comply with the Supreme Court's recent order) a TRO is warranted to ensure that the government provides the Court with protocol for how it will provide notice. *See J.G.G.*, 2025 WL 102409, at *2 ("'It is well established that the Fifth Amendment entitles [noncitizens] to due process of law' in the context of removal proceedings."). At a minimum, the notice must be translated into a language that individuals can understand, for Venezuelans Spanish and English. Most importantly, there must be sufficient time for individuals to seek review. As during World War II, that notice must be at least 30 days in advance of any attempted removal. And it must be provided to undersigned counsel so that no individual is mistakenly removed. *See*, *e.g.*, *Noem v. Abrego Garcia*, No. 24A949, 2025 WL 1077101 (U.S. Apr. 10, 2025).

The government has not provided Petitioner any notice as to the reason for his detention. The transfer of Petitioner from the Chicago Immigration Court's venue to another venue, and potentially removal from the United States, prevents Petitioner from being afforded a reasonable opportunity to respond to allegations. Petitioner has not been provided any notice of allegations which have caused DHS to detain Petitioner. Petitioner has not yet responded to the allegations in the NTA and in fact is scheduled to appear with counsel in the Chicago Immigration Court to respond to any allegations. The transfer of Petitioner prevents counsel from obtaining signatures needed to obtain documentation from DHS as to the reason for his detention. The transfer of Petitioner outside of Wisconsin or Illinois moves Petitioner to a venue other than the Chicago Immigration Court where Petitioner's 240 proceedings are pending and Petitioner is scheduled to appear on April 24, 2025.

### b. Removal of Petitioner from the United States Violates INA § 240

Congress carefully specified the procedures by which noncitizens may be removed. Pursuant to INA § 240(a)(3), "Unless otherwise specified by this Act, a proceeding under this section shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from the United States." ); *see also United States v. Tinoso*, 327 F.3d 864, 867 (9th Cir. 2003) ("Deportation and removal must be achieved through the procedures provided in the INA."). Indeed, Congress intended for the INA to "supersede all previous laws with regard to deportability." S. Rep. No. 82-1137, at 30 (Jan. 29, 1952).[4]

Congress was aware that alien enemies were subject to removal in times of war or invasion when it enacted the INA. *See Miles v. Apex Marine Corp.*, 498 U.S. 19, 32 (1990) (courts presume Congress drafts statutes with full knowledge of existing law). Indeed, the AEA was invoked just a few years before passage of the 1952 INA. With this awareness, Congress provided that the INA contains the "sole and exclusive" procedures for removal and declined to carve out AEA removals from standard immigration procedures, even as it expressly excepted other groups of noncitizens, including those who pose security risks. *See, e.g.*, 8 U.S.C. § 1531 *et seq.* (establishing fast-track proceedings for noncitizens posing national security risks). By ignoring the INA's role as the "sole and exclusive" procedure for determining whether a noncitizen may be removed, the Proclamation unlawfully bypasses the mandated congressional scheme and usurps Congress's Article I power in the process.

---

[4] One of the processes otherwise specified in the INA is the Alien Terrorist Removal Procedure at 8 U.S.C. § 1531 *et seq.* The Attorney General may opt to use this when she has classified information that a noncitizen is an "alien terrorist." *Id.* § 1533(a)(1). But even that process requires notice, a public hearing, provision of counsel for indigents, opportunity to present evidence, and individualized review by an Article III judge. *Id.* §§ 1532(a), 1534(a)(2), (b), (c)(1)-(2).

II.    **Petitioner Satisfies the Remaining Requirements for Injunctive Relief**

a.    **Petitioner Is and Will Continue to Suffer Immediate and Irreparable Harm**

In the absence of a TRO, Petitioner is at imminent risk of summary removal to places such as El Salvador, where he faces life-threatening conditions, persecution, and torture, and from which he may never be released. *See supra*; *J.G.G.*, 2025 WL 1024097, at *5 ("[I]nmates in Salvadoran prisons are 'highly likely to face immediate and intentional life-threatening harm at the hands of state actors.'"). That easily constitutes irreparable harm. *See Kahn v. Elwood*, 232 F. Supp.2d 344, 351 (M.D. Pa. 2002) ("possibility of torture" held to "weigh[] heavily in favor of concluding that Petitioner could face irreparable injury"); *Huisha-Huisha*, 27 F.4th at 733 (irreparable harm exists where petitioners "expelled to places where they will be persecuted or tortured").

Even if the government instead removes Petitioner to Venezuela, he faces serious harm there, too. Many fled Venezuela for the very purpose of escaping persecution there, and have pending asylum cases on that basis. And returning to Venezuela labeled as a gang member by the U.S. government only increases the danger, as they will face heightened scrutiny from Venezuela's security agency, and possibly even violence from rivals of TdA. *J.G.G.*, No. 1:25-cv-766-JEB, ECF No. 67-3 (Hanson Decl.) ¶ 28.

Not only does Petitioner face grave harm, thus far the government has tried to execute removals without any due process. *See Huisha-Huisha v. Mayorkas*, 560 F. Supp. 3d 146, 172 (D.D.C. 2021) (irreparable harm where plaintiffs "face the threat of removal prior to receiving any of the protections the immigration laws provide"). Although the Supreme Court has now made clear that meaningful notice is required under the AEA, *J.G.G.*, 2025 WL 102409, at *2, Respondents have yet to concede that they will provide meaningful notice, much less any sense of

when that notice will be provided to individuals or what form it will take. As such, there remains an unacceptably high risk that the government will deport individuals who are not in fact members of TdA.

### b.  Balance of Equities and Public Interest Weigh Decidedly in Favor of a Temporary Restraining Order

The balance of equities and public interest merge in cases against the government. *See Nken v. Holder*, 556 U.S. 418, 436 (2009); *Schrader v. Dist. Att'y of York Cnty.*, 74 F.4th 120, 126 (3d Cir. 2023) (citing *Nken* at 435). Here, the balance overwhelmingly favors Petitioner. The public has a critical interest in preventing wrongful removals, especially where it could mean a lifetime sentence in a notorious foreign prison. *See Nken*, 556 U.S. at 436. *See also Tenafly Eruv Ass'n, Inc. v. Borough of Tenafly*, 309 F.3d 144, 178 (3d Cir. 2002) (in the absence of legitimate, countervailing concerns, "the public interest clearly favors the protection of constitutional rights."); *Buck v. Stankovic*, 485 F. Supp. 2d 576, 586-587 (M.D. Pa. 2007) ("It is always in the public interest to prevent the violation of a party's constitutional rights.") (internal quotation marks and citation omitted); *Boone v. Brown*, No. Civ. 05-750, 2005 WL 2006997, at *15 (D.N.J. Aug. 22, 2005) ("[I]t is always in the public interest to ensure that any prisoner litigation affecting fundamental liberty interests comport with the requirements of due process). That is especially so given the government's position that it will not obtain the release of individuals mistakenly sent to the notorious Salvadoran prison.

Petitioner, moreover, does not contest Respondents' ability to prosecute criminal offenses, detain noncitizens, and remove noncitizens under the immigration laws. *Cf. J.G.G.*, 2025 WL 914682, at *30 ("The Executive remains free to take TdA members off the streets and keep them in detention. The Executive can also deport alleged members of TdA under the INA[.]"). Thus, Respondents cannot show how the government's interests "overcome the irreparable injury to

16

[petitioner] absent a stay, or justify denial of a short stay *pendente lite*." *Ragbir v. United States*, No. 2:17-CV-1256-KM, 2018 WL 1446407, at *18 (D.N.J. Mar. 23, 2018), *appeal dismissed*, No. 18-2142, 2018 WL 6133744 (3d Cir. Nov. 15, 2018); *see also Patel*, 2020 WL 4700636, at *9 (noting "any inconvenience to the Government from the brief delay is far outweighed by the threat of irreparable harm to [plaintiff]" and that "[t]he public interest is also better served by an orderly court process that assures that [the plaintiff's] invocation of federal court relief is considered before the removal process continues.").

## III. The All Writs Act Confers Broad Power to Preserve the Integrity of Court Proceedings

In addition to this Court's equitable powers, this is a textbook case for use of the All Writs Act ("AWA"), which provides courts a powerful tool to "maintain the status quo by injunction pending review of an agency's action through the prescribed statutory channels." *F.T.C. v. Dean Foods Co.*, 384 U.S. 597, 604 (1966); 28 U.S.C. § 1651(a); *California v. M&P Inv.*, 46 F. App'x 876, 878 (9th Cir. 2002) (finding Act should be broadly construed to "achieve all rational ends of law") (quoting *Adams v. United States*, 317 U.S. 269, 273 (1942)). If Petitioner is illegally sent to a foreign country, and El Salvador assumes jurisdiction, the government will argue, as it already has, that this Court no longer has jurisdiction to remedy the unlawful use of the AEA. *See J.A.V. v. Trump*, No. 1:25-CV-072, 2025 WL 1064009, at *1 (S.D. Tex. Apr. 9, 2025) ("A federal court has the power under the All Writs Act to issue injunctive orders in a case even before the court's jurisdiction has been established.").

Whereas a traditional TRO requires a party to state a claim, an injunction based on the All Writs Act requires only that a party identify a threat to the integrity of an ongoing or prospective proceeding, or of a past order or judgment. *See In Re: Nat'l Football League Players Concussion Injury Litigation*, 923 F.3d 96, 109 (3d Cir. 2019) ("[U]nder the All Writs Act, action is authorized

to the extent it is 'necessary or appropriate' to enforce a Court's prior orders. . . Or, as this Court has explained it, there is authority under the Act to issue an injunction where such relief is 'necessary, or perhaps merely helpful.'") (citing 28 U.S.C. § 1651 and *Pittsburgh-Des Moines Steel Co. v. United Steelworkers of Am., AFL-CIO*, 633 F.2d 302, 307 (3d Cir. 1980)); *ITT Cmty. Dev. Corp. v. Barton*, 569 F.2d 1351, 1359 (5th Cir. 1978) (court may enjoin "conduct which, left unchecked, would have . . . the practical effect of diminishing the court's power to bring the litigation to a natural conclusion"). Courts have explicitly relied upon the All Writs Act in order to prevent even a risk that a respondent's actions will diminish the court's capacity to adjudicate claims before it. *See Michael v. INS*, 48 F.3d 657, 664 (2d Cir. 1995) (staying an order of deportation "in order to safeguard the court's appellate jurisdiction" and preserve its ability to hear subsequent appeals by the petitioner).

## IV.   The Court Should Not Require Petitioner to Provide Security Prior to the Temporary Restraining Order

Rule 65(c) of the F.R.C.P. invests this Court with discretion as to the amount of security required and whether to waive the requirement altogether. *See Temple Univ. v. White*, 941 F.2d 201, 219 (3d Cir. 1991), *cert. denied sub nom.*, *Snider v. Temple Univ.*, 502 U.S. 1032 (1992). District courts routinely exercise this discretion to require no security in cases brought by indigent and/or incarcerated people. *See*, *e.g.*, *S. Camden Citizens in Action v. N.J. Dep't of Envtl. Prot.*, 145 F. Supp. 2d 446, 504 (D.N.J. 2001); *Cradle of Liberty Council, Inc. v. City of Philadelphia*, No. CIV.A. 08-2429, 2010 WL 760250, at *1 (E.D. Pa. Mar. 2, 2010). This Court should do the same here.

### CONCLUSION

The Court should grant a Temporary Restraining Order as to the Petitioner.

Dated: April 14, 2025                              Respectfully submitted,


                                                   /s/ Laura Smith
                                                   _____
                                                   Laura Smith (ARDC 6300907)
                                                   Laura@ChildrensLegalCenterChicago.org
                                                   Brigitte Nuss Kocheny (ARDC 6227001)
                                                   Brigitte@ChildrensLegalCenterChicago.org
                                                   Children's Legal Center
                                                   1100 W Cermak Rd., Suite 422
                                                   Chicago, Illinois 60608
                                                   (312) 722-6642

                                                   *Attorneys for Petitioner*